IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

ELECTRONICALLY FILED
Jun 23 2021
U.S. DISTRICT COURT
Northern District of WV

| | | |
|---|---|---|
| RANDY LUNA, | ) | Civil Division |
| | ) | |
| Plaintiff, | ) | No.  **1:21-CV-83 (Keeley)** |
| v. | ) | |
| | ) | |
| MONONGAHELA POWER COMPANY | ) | |
| D/B/A FIRSTENERGY CORP. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

AND NOW COMES Plaintiff Randy Luna ("Plaintiff"), by and through his undersigned counsel, and brings this Complaint against Defendant Monongahela Power Company d/b/a FirstEnergy Corp setting forth violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and the West Virginia Human Rights Act ("WVHRA"), stating as follows.:

## PARTIES

1. Plaintiff is a 42-year-old male individual who resides at 305 Pleasant Street, Mannington, West Virginia, 26582.

2. At all relevant times hereto, Defendant Monongahela Power Company ("FirstEnergy" or "Defendant" or the "Company") was Plaintiff's employer.

3. Plaintiff was employed as an Operator at the Harrison Power Station, a coal-fired electricity-generating power station located in Haywood, West Virginia, owned and operated by FirstEnergy.

4. Monongahela Power Company is and was an Ohio Corporation with a principal office address of 5501 Nasa Boulevard, Fairmont, West Virginia, 26554.

5. At all relevant times hereto FirstEnergy was acting through its agents, supervisors, directors, officers, employees and assigns.

## JURISDICTION AND VENUE

6. Plaintiff asserts the claims herein pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and the West Virginia Human Rights Act, W.Va. Code §5-11-1 *et seq.* ("WVHRA").

7. This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331 because Plaintiff's Title VII claims arise under federal law. This Court has supplemental jurisdiction over Plaintiff's claims under the WVHRA pursuant to 28 U.S.C. §1367.

8. Venue is appropriate in the U.S. District Court for the Northern District of West Virginia pursuant to 28 U.S.C. §1391(b) because Defendant conducts business in this judicial district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTS

9. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

10. Plaintiff worked for Defendant as an Operator at the SO2C Unit at the Harrison Power Station from February 17, 2020, until his termination on or about November 6, 2020.

11. Mr. Luna met the training, education and experience requirements of Defendant and passed the same exam all Operators were required to pass at the time of his hire.

12. Upon his hire, Mr. Luna was assigned a trainer, Amber Moyers.

13. Within the first two (2) weeks of his hire, when Mr. Luna divulged that he was Hispanic and Native American, Ms. Moyers and other co-workers began mocking Native American culture, making calling and chanting sounds when Mr. Luna would enter an area.

14. Ms. Moyers refused to provide Mr. Luna with the one-on-one training and training materials that his Caucasian comparators received.

15. Ms. Moyers and Mark Ordak (Union Steward) peppered Mr. Luna with illegal questions and comments, asking about his "weird" accent, religion and background.

16. They also inferred that he did not have the necessary education to hold the position, making comments such as, "*you have to go to college to do this job*."

17. Mr. Luna complained to his immediate supervisor, Jim Harley, of the hostile work environment that Ms. Moyers and Mr. Ordak created.

18. Rather than take the complaint seriously and follow the Company's policy regarding complaints of harassment and/or discrimination, Mr. Harley told Mr. Luna that it was just "guys being guys" and that he should expect to be hazed for a while.

19. Mr. Luna asked and was told that his complaint would be kept confidential.

20. Mr. Luna learned that Mr. Harley and Ms. Moyers are friends, and that Mr. Harley disclosed the details of the complaint to Ms. Moyers.

21. During this conversation, Mr. Luna also asked for a new trainer and his request was refused.

22. After learning of Mr. Luna's complaint, Ms. Moyers commented to him, "*I have been here longer than you, and I'll be here longer than you.  I can guarantee, your days are numbered*," outwardly threatening Mr. Luna's job.

23. In late March 2020, Ms. Moyers sprayed Mr. Luna with Lysol while saying he had COVID-19 because he was "Mexican." She began calling him the "corona kid."

24. Mr. Luna made another complaint to his supervisor, Mr. Harley, following this event and Mr. Harley, again, ignored the illegal behavior that his team was perpetuating.

25. Ms. Moyers also attempted to get Mr. Luna terminated or laid off by making a claim to their supervisor that Mr. Luna was a "non-essential" worker, per the Governor's mandate.

26. Ms. Moyers further created lies about Mr. Luna that resulted in him being tested for COVID-19 on two occasions (each of which resulted in a negative test).

27. Mr. Luna continued to make complaints regarding Ms. Moyers' refusal to properly train him.

28. For example, Ms. Moyers would pass Mr. Luna off onto less experienced operators (who were not qualified as trainers) and would make comments to them such as "*I can't deal with him;*" "*I don't want to work with him;*" and "*I can't teach this guy, he's dumb.*"

29. Mr. Luna learned that John Fleeman (Caucasian) and Pete (last name unknown) who were hired after him in the same SOC2 Operator position received the training manuals that he had requested that were never provided.[1]

30. Because he was not provided with the requested training manual, Mr. Luna brought a notebook to work and began writing his own notes regarding how his job was to be performed, based upon his observations.

31. He continued to take notes for approximately three months., asking more experienced Operators for assistance, since Ms. Moyers refused to train him.

---

[1]. Similarly, Mr. Fleeman was assigned a locker in the Changing Room inside of the Unit in which he worked—whereas Mr. Luna was assigned a locker outside of his Unit.

32. One Monday morning Mr. Luna went into work and found his notebook had been defaced and destroyed by Mr. Ordak.

33. Mr. Ordak crossed out all of the notes that Mr. Luna took, making them impossible to read, in an effort to further set him up for failure.

34. Mr. Ordak drew pictures of penises in the notebook and wrote "*RL is a cocksucker*."

35. Also written in the notebook was "*my partner is a snitch*," verifying Mr. Luna's suspicions that his conversations with Mr. Harley were not being kept confidential.

36. Around this time someone also painted a picture of a penis with Mr. Luna's name on it on one of the walls in the Unit.

37. The Company also began to retaliate against Mr. Luna for his complaints around this time.

38. For example, when Mr. Luna began his employment, he was being given significant overtime, Sunday premium shifts and night shifts, totaling upwards of 60 hours per week.

39. After he began to oppose the discrimination that was occurring, Mr. Luna's hours were cut significantly.

40. Also, two other SO2C Operators John Fleeman and Pete (last name unknown) received six-month evaluations and raises.

41. Mr. Luna was not provided with either because Ms. Moyers refused to engage him in this process or to sign off on his promotion.

42. In approximately September 2020, Mr. Luna was then assigned a new trainer, Joe Pelligrin.

43. Mr. Luna explained to Mr. Pelligrin the lack of training provided by Ms. Moyers.

44. Mr. Pelligrin was a Union Member and assured Mr. Luna that he would assist him with his complaints and would try to catch him back up with his training.

45. Mr. Pelligrin asked Mr. Luna why he did not go to the Union with his discrimination complaint, and Mr. Luna explained that one of his main discriminators was Mr. Ordak—the Union Steward. Thus, he did not feel safe going there.

46. Mr. Pelligrin advised Stu Whitehair, Union Vice President, of Mr. Luna's treatment and Mr. Whitehair assured Mr. Luna that he would speak to Mr. Ordak and handle the issue.

47. Mr. Luna was also approached by another Unit Manager, Lloyd Spry, who was just transferred to the Unit.

48. Mr. Spry told Mr. Luna that he saw the graffiti, he noticed Mr. Luna was being isolated by his co-workers and asked him what was going on.

49. Mr. Luna explained to Mr. Spry everything that occurred.

50. Mr. Spry set up a meeting with Human Resources Manager, Jada Santanos, which took place in or around early October.

51. During the meeting, Mr. Luna explained what transpired and expressed that he felt his job was being threatened.

52. Ms. Santanos questioned Mr. Luna with respect to how he knew Mr. Ordak was the one that defaced his notebook and drew the graffiti picture of the penis with his name.

53. Ms. Santanos was very defensive of the other employees' conduct.

54. Mr. Luna provided Ms. Santanos with post-it notes signed by Mr. Ordak as a match for the identical handwriting contained in his destroyed notebook.

55. Ms. Santanos assured Mr. Luna that an investigation would be conducted.

56. Mr. Luna was never interviewed, thereafter, as part of the investigation.

57. Ms. Santanos refused to return Mr. Luna's defaced notebook and reported to him (approximately one month later) that there were "inconclusive findings."

58. On or about November 5, 2020, shortly after the investigation concluded, Mr. Luna was illegally fired.

59. He was called into a meeting (without Union representation) and was told that he was being terminated because of his performance.

60. Mr. Luna was advised (for the first time) of three claimed deficiencies which the Company used as pretext to support his firing.

61. Prior thereto, Mr. Luna had no written warnings or even so much as a verbal reprimand with respect to his performance, demonstrating the Company's unwillingness to follow its progressive discipline policy.

62. Two of the instances cited in the Company's termination letter (with the most recent being on October 20, 2020) related to Mr. Luna's verification of valves being closed where the Company claimed it later discovered the valves were not closed.

63. No additional details were provided as to how it was determined that it was actually Mr. Luna who left the valve open.

64. Mr. Luna documented that the closed the valves at the time he completed the action.

65. Upon information and belief, they were thereafter re-opened by Mr. Luna's co-workers and reported in an effort to get Mr. Luna fired.

66. As a result of Defendant's unlawful conduct, Plaintiff has suffered lost wages – both back and front pay – in the form of compensation, overtime, bonuses, lost benefits and lost retirement benefits.  Plaintiff has also suffered mental anguish, medical expenses, humiliation, and other general damages for which Defendant is liable.

67. At all times relevant hereto, Defendant was Plaintiff's employer, and was an employer within the meaning of and subject to Title VII and the relevant anti-discrimination and anti-retaliation statutes.

68. Plaintiff was in a protected class under Title VII and WVHRA at the time the acts of discrimination, retaliation and wrongful termination occurred.

69. At all relevant times hereto, Defendant acted or failed to act by and through its duly authorized agents, servants, and employees, who conducted themselves within the scope and course of their employment.

## COUNT I
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000E ET SEQ. – DISCRIMINATION

70. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

71. Plaintiff is an "employee" as that term is defined at 42 U.S.C. §200e(f).

72. Defendant is an "employer" as that term is defined at 42 U.S.C. §200e(b).

73. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") prohibits discrimination based upon race and national origin in employment.

74. Based upon the above-described acts, practices and omissions, Defendant engaged in unlawful discrimination under Title VII based upon the Plaintiff's race (Hispanic) and national origin (American Indian).

75. Furthermore, Defendant's illegal actions against Plaintiff, including harassment by Plaintiff's supervisors, were aimed at Plaintiff because of his race/national origin.

76. Such illegal actions (including Defendant's refusal to appropriately train Plaintiff) resulted in adverse impacts to the terms and conditions of his employment and further subjected him to harassment and a hostile work environment.

77. Defendant's conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

78. At the time the above-described conduct occurred, Plaintiff believed his work environment to be hostile or abusive.

79. Defendant knew, or should have known, of the illegal actions taken by its employees, agents or contractors against Mr. Luna and taken prompt, remedial action to prevent such actions.

80. As such, Defendant violated Title VII and discriminated against Plaintiff by not only subjecting him to sufficiently severe or pervasive harassment based upon racial and national origin stereotypes so as to alter the conditions and term of Plaintiff's employment, but also: failing to act and condoning or tolerating such harassment, subjecting Plaintiff to less favorable terms and conditions of employment by imposing heightened and/or disproportionate discipline on Plaintiff; failing to appropriately train Plaintiff to successfully perform his position; and terminating his employment.

81. The reasons Defendant submits for changing the terms and conditions of Plaintiff's employment and ultimately terminating him are false and pretext for unlawful discrimination.

82. In unlawfully discriminating against Plaintiff, Defendant acted willfully, wantonly and/or with malice or with conscious and/or reckless indifference to Plaintiff's equal rights under the law, thereby necessitating the imposition of punitive damages.

83. As a result of Defendant's above-described conduct, Plaintiff has suffered loss of income, emotional pain and suffering, embarrassment and inconvenience and he is entitled to general and special damages, and economic damages including, but not specifically limited to, front and back pay. Plaintiff is also entitled to and seeks his attorneys' fees and costs pursuant to 42 U.S.C. §2000e-5(k).

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra.*

## COUNT II
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000E ET SEQ. – RETALIATION

84. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

85. Title VII, 42 U.S.C. §2000e-3(a) states in relevant part that "[i]t shall be an unlawful employment practice for an employer…to discriminate against any individual,…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participate din any manner in an investigation, proceeding or hearing under this subchapter."

86. Plaintiff engaged in activity protected by Title VII on multiple occasions. Specifically, he opposed Defendant's unlawful and discriminatory practices under Title VII by submitting multiple complaints to his supervisors and Human Resources.

87. Plaintiff's opposition and complaints regarding Defendant's illegal practices were protected activities within the meaning of 42 U.S.C. § 2000e, *et seq*.

88. Defendant unlawfully retaliated against Plaintiff in the terms and conditions of his employment and subjected him to further harassment because he engaged in the above-described

statutorily protected activities.  For example, Defendant, among other things, failed to follow its own policies regarding discipline and subjected Plaintiff to altered terms and conditions of employment when Defendant's investigation of Plaintiffs' repeated complaints resulted in Plaintiff's termination for manufactured reasons/conduct.  Defendant further refused to appropriately and properly train Plaintiff to do his job, following his complaints, in an effort to set him up for failure.  Defendant further failed and refused to take corrective action that would prevent Plaintiff from being subjected to further harassment.  Rather, Defendant shared Plaintiff's confidential complaints with Plaintiff's harassers, resulting in more severe

89. Due to Defendant's retaliatory conduct and refusal to take any corrective action to prevent Plaintiff from being subjected to further harassment, Defendant retaliated against Plaintiff for engaging in protected activity.

90. A casual connection exists between Plaintiff's protected activities and Defendant's unlawful termination of Plaintiff.

91. In unlawfully discriminating and retaliating against Plaintiff, Defendant acted willfully, wantonly, and/or with malice or conscious and/or reckless indifference to Plaintiff's equal rights under law, thereby necessitating the imposition of punitive damages.

92. As a result of Defendant's retaliatory conduct, Plaintiff has suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience and he is entitled to general and special damages, and economic damages, including, but not specifically limited to back and front pay.  Plaintiff is also entitled to and seeks his attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra.*

## COUNT III
## VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT

93. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

94. At all relevant times herein, Plaintiff was an "employee" within the meaning of West Virginia Section Code 5-11-3(e).

95. At all relevant times herein, Defendant was an "employer" within the meaning of West Virginia Code Section 5-11-3(d).

96. West Virginia Code prohibits discrimination in employment based on race, and national origin. (West Virginia Code Sec. 5-11-1 *et seq*.). The Act also prohibits retaliation against an employee for exercising his or her rights under the Act.

97. In unlawfully discriminating and retaliating against Plaintiff, Defendant acted willfully, wantonly, and/or with malice or conscious and/or reckless indifference to Plaintiff's equal rights under law, thereby necessitating the imposition of punitive damages.

98. As a result of Defendant's retaliatory conduct, Plaintiff has suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience and he is entitled to general and special damages, and economic damages, including, but not specifically limited to back and front pay. Plaintiff is also entitled to and seeks his attorneys' fees and costs pursuant to West Virginia Code Section 5-11-13.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra.*

## DEMAND FOR JURY

WHEREFORE, Plaintiff demands judgment against Defendant, and damages in excess of $75,000 as follows:

a. That Plaintiff be awarded actual and consequential damages to make Plaintiff whole including back pay with prejudgment interest, front pay and compensation for lost benefits, in an amount to be proven at trial, and other affirmative relief necessary to eradicate the effects of Plaintiff's damages associated with Defendant's discrimination, retaliation and wrongful termination of Plaintiff in violation of the Title VII and the WVHRA plus interest;

b. That Plaintiff be awarded compensatory damages to compensate for all costs associated with the discrimination, retaliation and wrongful termination including lost wages and medical expenses;

c. That Plaintiff be awarded nominal damages;

d. That Plaintiff be awarded punitive damages in an amount sufficient to punish Defendant for its intentional, wanton and malicious conduct and to deter similar misconduct;

e. That Plaintiff be awarded the costs of this litigation, including reasonable attorney's fees; and

f. That Plaintiff be awarded such further relief as deemed to be just and proper.

Date: June 23, 2021                     Respectfully Submitted,

*/s/ Stephanie L. Solomon*
Stephanie L. Solomon, Esquire
W.V. ID No. 12640
HKM EMPLOYMENT ATTORNEYS LLP
220 Grant Street
Suite 401
Pittsburgh, PA  15219
412.760.7802
ssolomon@hkm.com

**JURY TRIAL DEMANDED**